Good morning, Your Honors, and may it please the Court, Peter Stris on behalf of the Appellant. In mid-2008, the Food and Drug Administration put defendants on notice that cancer findings in a mandatory rat study presented an extraordinarily serious risk to the approval of their new diet drug, lorcazarin. That risk never went away, and in fact resulted in denial of defendants new drug application by the FDA in September of 2010. Nonetheless, throughout that entire two-and-a-half-year period, defendants never once disclosed the rat cancer findings or the FDA's expression of serious concern. To the contrary, defendants repeatedly made affirmative statements suggesting that there was no specifically known threat to FDA approval. Now, we're here on a motion to dismiss, a 12B6 motion, for lack of C-enter. And so I think I'd like to locate my comments by being very clear about what our theory of fraud is and what our position on C-enter is. Our theory of fraud, in one sentence, is that defendants intentionally misled the public about a known material risk to FDA non-approval or delay. And as we're required to under the PSLRA, we had a complaint that alleged, with extraordinary particularity, the misrepresentations and omissions at issue. So in the second amended complaint, you can find nine specific omissions. In the second amended complaint, and you can find this in the record, pages 136 to 164, these are paragraphs 130 to 251, we set forth over 50 alleged misstatements. Counsel, are we supposed to be looking at the SAC or the third amended complaint? Which one's at issue? So I would urge you to look at both, but more particularly the second amended complaint. Because we have a two-tiered position. Our primary position is that the district court erred in dismissing, albeit without prejudice, the second amended complaint. And if you go back and look at her order, she dismissed it without prejudice and then gave us very constricting rules about how we could attempt to amend. So the proposed third amended complaint is instructive in that there's certain allegations in it that I think help us, but it doesn't really set forth the theory of the case that we intended to litigate. So the SAC is sort of the broader theory of the case. You streamlined this in response to Judge Benjamingo's order. Yes, Judge Bybee. And we streamlined it in ways that I think still satisfy the PSLRA, but that, in my view, make our case weaker in ways that we're not required to. Are there any material differences in the statements that you thought were misleading between did you drop anything, did you abandon anything in the third amended complaint? I believe things were removed, but in my view, and this I hope goes to the heart of your question, I think of those statements, there are three that are the strongest for us. And there, I believe in both, and I kind of like to walk through them. So I'd like to start with the following background, which I think is important. We have to understand what happened in mid-2008. And the best place to figure out what happened is to look at the FDA's own document. It's obviously an unbiased source in this regard. And that you can find in the supplemental excerpt of record, pages 65 to 67. And it's actually rather extraordinary, because what the FDA says is that at the time they got the follow-up rat study results, they, and I'm going to quote, discussed internally whether the lorcazarin IND should be placed on clinical hold due to the non-clinical tumor cancer data. The sponsor was made aware of our concerns and was asked to meet with us to defend continuation of their clinical development program. So this background is important, because this is not a typical case where the FDA is asking a few questions. This is a case where the FDA says, we're so concerned by these cancer findings, that we want you to come in and meet with us and convince us that you should be able to continue running your human trials. When did this happen? So this happened in April of 2008. Is that just after the FDA request for bimonthly reports and follow-up studies? I wouldn't say just after. They had gotten, I believe, four bimonthly reports. But it's before the final results, which happened... Before the final results. And that... That's what I'm trying to do, is put it in perspective to dates based on statements. And that's precisely what I'm going to get to. So I needed to give you that background. Now to your question, Judge Smith. So this is after four bimonthly reports. They have the meeting. The company convinces the FDA to let them move forward with the human studies, the human trials. And the FDA says, we're willing to do that because the human trials are not indefinite use. But we want a final report. The final report comes in February of 2009. And now I'm going to get Judge Bybee to the statements. I believe the first terrific statement for us, or terrible statement, depending on your vantage point, is the May 12, 2009 statement of CEO Leaf. And you can find the actual statement on page 380... No, you're on the long-term safety and efficacy. No. No, you're on it. This is the one that's on page 387 of the record. That's the relevant page of the earnings call transcript. And we pled this on paragraph 145 of the second amended complaint, which is on pages 139 and 140 of the record. Here's what happened. During the earnings call, the CEO expressed confidence in Lorcasarin. And one of the analysts said, okay, Mr. Leaf, what's happened since the R&D stage that gives you this increased confidence? Because the discussion up until then had been about the human trials. And the CEO says, and I'm paraphrasing, but I told you the page in the record, the CEO says, oh, it's not just the human trials. My confidence is based on them, the phase one and phase two trials, and all of the animal studies that have been done so far. So I think this statement is very significant, particularly when I layer on top of it what happened next, because you have a CEO who knows that there were cancer findings, who knows that the FDA months earlier required a meeting to even continue the human studies. The CEO knows that the FDA has not had the final document for but a month. They haven't even had a chance to review it. And he's expressing confidence based on the animal studies. We think this is very significant. Okay. So you've got to plead a material misrepresentation or omission. After you plead the material misrepresentation or omission, then you have to plead the scienter. Why does that not just get us past material misrepresentation or omission? Why does it go to the scienter? So I think, as this court has repeatedly said, it's often a unitary inquiry when you're dealing with the PSLRA. I understand. And the reason why it gets us past it here is the question is, what do we need to plead there was intent to do? And so our whole point, our theory Let me tell you why I asked the question. Why isn't this just another AstraZeneca? Well, AstraZeneca was A fight between the company and the agency about the interpretation of a rat study, and we said there's no scienter. Well, I think AstraZeneca is the Southern District of New York case, but I Understand. I'm just taking the judiciary said. So I think I'm not trying to say the Ninth Circuit because I know where Astra came from, but I'm just trying to say, why isn't that another AstraZeneca problem? Well, I think that the simple way to distinguish the cases is the fact that in AstraZeneca, the underlying data was disclosed. The plaintiffs in AstraZeneca were arguing that the disclosures about the study and the risks were insufficient. This couldn't be more different. They never mentioned that there were any cancer findings in the first place. They never mentioned that the FDA expressed any concern in the first place. If you're a reasonable investor and you hear, well, there's a required animal study, the CEO tells you, I'm confident based upon the animal study, you stop asking questions. And unsurprisingly, that's what happened for two years. The analysts and investors started asking questions about the human studies because they were given the impression that there was nothing to raise a red flag about the animal studies themselves. Now, let's look at this in context, Judge Smith. Let me take you through, because you said you wanted to know about the time period. Well, what I was trying to do is know just exactly where you were suggesting. Now I know what you were talking about. I know where it was. Okay. Well, but I think building on kind of the import of your question, which is that the timing of these representations matters, I want to talk next about the September 18, 2009 statement that Defendant Anderson made. Now, she's a scientist who is the head of the Lorcasarin Program. You can find this on page 270 of the record, and we pled it in paragraph 190 of the Second Amended Complaint, which is on page 151 of the record. This is in the context of another earnings call where she is asked, well, where are we at on the new drug application? And she says, and again, I'll paraphrase, we've compiled everything that we're, we've done all the studies that we're going to do, and everything that we've collected is favorable so far. Now the reason this is very important is the strongest argument, I think, in my opponent's brief, is the notion that, well, the defendants thought that this was settled. Once the April 2008 meeting happened, you know, we thought this issue was resolved, and so we were as surprised as anyone when, come 2010, the FDA says that we're wrong. The problem for my friend is that the facts, even as alleged, don't bear that out. There was a meeting with the FDA just one month prior to this September statement. It's an August 2009 meeting. We allege this on, in paragraph 74 of the Proposed Third Amended Complaint. It's on page 64 of the record. Sorry, that was, that was your paragraph 74? Paragraph 74 of the Proposed Third Amended Complaint, correct. Defendants concede the fact, in their brief. It's footnote 18, page 36. They try and bury it. It's good advocacy. But it's important because what we allege is that at this meeting, one month before Defendant Anderson says everything is favorable, the FDA says, you better put information on the breast tumors in your new drug application. That is not an indication that the issue is resolved. And I can take you a step further, and I think this is an extraordinarily compelling inference. Let's look at what the defendants did. They hired a world-leading expert on the significance of rat cancers to human cancers. We pled this on paragraph 32 of the Second Amended Complaint. You can find this gentleman's testimony before the FDA on pages 206 to 209 of the Supplemental Page 13, admit that he created slides and he worked on this presentation for months. So I think at the end of the day, what this comes down to, and then I'm going to get to the third representation, is what defendants are trying to argue is that they had the belief that they were likely to persuade the FDA that they were right. That's targeting the FDA. They believe that the issue was settled. Because when the FDA says they have a concern that's so serious that they might shut you down, and when you have no reason to believe that the issue is settled, that you're told to include it in your application, and you hire a scientist to focus on it, to not tell the public that the cancer ever happened, that the FDA ever asked about it, and to make statement after statement, and I want to just briefly touch on the third one, that suggests that there's not a problem, we think that that's a garden variety securities fraud. So let me touch on that final statement. And this is the November 10, 2009 statement of the chief medical officer of the company. It's on page 286. This is the Shanahan statement? The Shanahan statement, yes. And in context, perhaps this is the most damning, because if you look at what the analyst is asking, the analyst asks him, well, have you considered any follow-up studies with the FDA? I think he talks about Phase IV and REM studies, which is what you would do if there was a risk identified that the FDA was concerned about. And what the chief medical officer says is, well, he admits, we met with the FDA, and he's not referring to the April 2008 meeting. He's talking about the pre-NDA meeting. And based upon the meeting, we don't see any strong safety signals to pursue. This case would never have happened, there never would have been a problem, if the very simple disclosures that ARENA issued after the cat was out of the bag had been issued at the time. It took them two sentences to say, the FDA is concerned about some cancer findings, we think they're wrong, we're confident we will prevail. They did not find it difficult to make those disclosures once the market already had the information and the stock had collapsed. They found it extraordinarily difficult to make those disclosures over a two-year period, and for obvious reason. And when I say obvious, I'm talking inferentially, because in any PSLRA case, that's all we have. We're trying to figure out who has the more plausible inference, not what discovery or the evidence will show. That's the second stage of the game. Why does what you've suggested to us thus far meet the deliberate recklessness standard of Zuckel? Okay, so you mentioned that case, which is certainly a Ninth Circuit case on point. I would also I'm bound by that one, that's why you got that one. Well, you certainly are, but you're also bound by Reese, the 2014 case that we cite I understand, but Zuckel is pretty much, I mean, that says what I've got to find, deliberate recklessness. Oh, it certainly does. And both of those cases, although I prefer the exposition Extreme departure from the standards of ordinary care Extreme departure from the standard of ordinary care, and it actually goes a step further. Let me make the case harder for me, and then show you how we meet it. It says that it has to be an extreme departure from the standard of ordinary care, and that the disclosures could not have required extraordinary effort. Here I actually think it's the paradigmatic example of that standard being met. There's no argument here that the defendants did not know about the cancer findings. They admit that. There is no argument that they did not know that the FDA was extraordinarily concerned. They admit that. There's no dispute that they hired an expert to present on the question, which the obvious inference is that the issue was not resolved. And there's really no dispute, because they effectively concede this in their brief, Judge Smith, that any average investor would find this information material. So I think if ever there were a case, circumstantially, that gave rise to the inference that defendants departed extraordinarily from the standard of care, it's this one. A two-sentence disclosure would have been no effort. In fact, they made the disclosure later, and it would have allowed investors to decide, do they want to ask follow-up questions? Do they agree with the company about this level of risk? They deprived investors of that opportunity. And the only way they win, based on Telab's and the Ninth Circuit's progeny, is if they can convince you that the more plausible inference is that either they were clueless, they were the people who had an empty head, honest heart, or that they were merely negligent. And I think that if the facts of this case, as we have alleged them here, with multiple stages of pleading carefully looked at, and now on de novo review, does not meet that standard, then, in essence, what you'll be deciding is that no case in this context can satisfy, circumstantially, the PSLRA. And with all due respect, I don't think that's what Congress intended in passing the statute. So if there are no further questions, I would like to — oh, I've gone over. Well, then, there's nothing for me to reserve. Thank you. Good morning. May it please the Court, I'm John Dwyer on behalf of Arena Pharmaceuticals and the individual defendant appellees. I think chronology does matter, and so I'd like to address the chronology first. I urge the Court to review three documents which set out the chronology and the history of the communications between Arena and the FDA during the relevant time period. And those three documents are Arena's submission to the Advisory Committee meeting that took place in September of 2010 that can be found at about that same time. That can be found at SER 43 to 46. And then, finally, the FDA's briefing book in 2012, when it ultimately decided to approve Lurcasarin. That can be found at SER 95 to 101. When you look at those three documents, there's no way one can review them and conclude that Arena's analysis, with regard to the final RAC study — and I'm going to walk through the chronology because the key is the final RAC study — there's no way to conclude it was irrational or unreasonable. In fact, it was compelling, it was thoughtful, and their analysis — I'm sorry, I've missed the context. What was thoughtful and what was compelling? The analysis and, therefore, the belief of Arena Pharmaceuticals with regard to the results of the RAC study at the time that they submitted it to the FDA in early 2009. Yeah, I don't think their point is that Arena didn't think that they had an answer. I think that this was open for scientific debate. I think the concern is that they had people making public statements that were assuring the public that there was no adverse information about Lurcasarin and that that was not true. Your Honor, if that is the theory now, it has shifted a little bit. But to be clear, the regulatory process between the FDA and the regulated industry is full of back and forth. Oh, I understand. It was very fluid. But what is at issue here is not whether there's some fluidity and whether there's room for scientific disagreement and room for an opportunity to persuade the FDA. You ultimately persuaded the FDA. You hired very responsible people and seemed to pursue this with the FDA in a responsible manner. That's not the allegation as I understand it. I don't think that was the theory of either the second or the third amended complaint, and I don't think it's the way the district court saw this. But what they have alleged is that when you went out and spoke to the public, that you assured them that based on the animal studies, completed to date, that there was no problem and that that's not true. That the animal studies did have a problem and that you were currently involved in a very intense debate with the FDA over this and that there was some question as to therefore whether the FDA would approve it. So let me parse that a little bit because the chronology does matter. We were not engaged with an intense debate. By the way, the language extraordinarily concerned isn't found anywhere in the record. There was an exchange in 2007 and 2008 with regard to the FDA, with regard to the interim rat results. In February of 2009, ARENA submitted the final rat study results as well as these things called the prolactin analyses or the mechanistic studies. There is not any suggestion of communication from that period of time until September of – with one exception, which I'll get to – until September of 2010 in which FDA ever said, hey, we continue to be concerned about the tumors, or we don't think – we disagree with your analysis, or we think you need to do some additional work. And when you look at those three documents that I urge you to review, you will see there's no communication during that time. The only meeting the council identified this morning was what's called a pre-NDA meeting. That's a routine meeting, so there's nothing out of the ordinary with regard to the pre-NDA meeting. This is in 2009, and that is a regular part of the regulatory routine. ARENA and its executives sat down with FDA, and they talked about what should be included in the NDA application. But the problem, I guess, comes – I mean, I tried to do, and that's why I made him talk about dates. It seems to me that the first, if you will, problem that your company has is that there is a submission of the RAT study. The FDA looks at it and says, I mean, even if I go with your idea of a good time, that you've got to now give bimonthly reports, and you've got to give follow-up studies. And their argument is, and I think the allegations of the complaint are, these are highly unusual things to happen. And because they're highly unusual to happen, then in context, we have what you're now talking about. So, Your Honor, I would like to spend one more moment on the chronology, because I think I need to set that out in order to answer your question. So what happened was, in mid-2007, in the midst of the RAT study, ARENA identified that there was a higher incidence of tumors than they would have expected. Correct. That was in 2007. That's right. They reported that to the FDA. There's a series of communications that take place with the FDA by letter and by telephone call, where they ask for these bimonthly reports. They then say, we want to sit down, and they sit down in April of 2008. And at that point, the decision is made to let the clinical studies go forward, but continue the bimonthly reports. And the FDA says, as soon as you finish the RAT study, submit it to us, because we really want to see it. But they say, we're going to let the clinical studies with the humans go forward, because the drug exposure rate is much higher than we expect, and the human risk group, we think, is minor, if at all. So the company then submits, in February of 2009, the final RAT study, as well as the prolactin studies. We do not, there's nothing in the complaint, other than the pre-NTA meeting, NDA meeting, which is a routine meeting, in which there's no specificity provided. Nothing from that point forward suggests that the FDA is at all concerned about tumors at that point. As far as the arena is concerned, this is not like AstraZeneca in the sense of, there's, I mean, we like AstraZeneca, but there's no disagreement taking place. There was an issue. We were doing a RAT study. There was an issue. The FDA said, here's how we want you to address it. We want you to show that there's no relevant risk to humans. We finish the study. We submit the report. We say, we believe there's no relevant risk to humans for the following reasons. There's a safety margin, and there's this prolactin hypothesis, and then we don't hear from them from that day forward. So then, when these statements come forward, when somebody asks the company or one of the officers of the company, when in 2009 did ARENA submit its final RAT studies to the FDA? February of 2009. And there's not another, again, other than this statement that sometime in 2009 in the pre-NDA meeting, which is a routine meeting, that they talked about a bunch of things of what should be in the NDA, which included the RAT study. By the way, what's in the NDA is information. It's millions of pages long. It's got the RAT study. It's got the mouse studies. It's got the monkey studies. It's got the 18 clinical trials and the 100 preclinical trials. All of that is in the NDA. There's no communication in which the FDA has any concern about the final RAT study results until the briefing book in September of 2010. And by the way, Your Honor, what's amazing... Well, the worry that I have is if you've got the FDA requesting, if you will, studies and or reports and or whatever that suggests that they're not satisfied with the events of the RAT study, and it is highly unusual, then how do you go out and say that all of the preclinical studies that were done and all of the animal studies are okay? So again, just to be clear, the FDA never expressed a concern about the final RAT study. Just to be clear, the final RAT study is not done until February of 2009. Well, why would they have even asked? If they didn't have any problem, it seems to me from reading what I do in the complaint and what I've read in the briefs, they wouldn't even have requested a bimonthly report if there wasn't a problem. They wouldn't have requested a continuous... I mean, they allowed the human studies to continue, but they wouldn't have requested all of these follow-up things if there was not a problem. And then you're saying, well, there's nothing in the animal studies that show us any problem. And I think that's what his point is. So let's talk about the statements. The first statement, the March 2009 statement by Mr. Leaf, in which he's asked, what's the base of your confidence? And he says, the confidence is based on phase 2 data, phase 3 data, all the animal studies, the clinical trials, etc. So first, Your Honor, identifying why you're confident is a statement of opinion, in my view. That's why our 28J letter, we identified Omnicare as well as the Sanofi decision, which we think are very important. So the answer is, explain to me why you're confident. So he simply said, we're confident. I think everybody would say that was an opinion, and as long as it was honestly held, there's not an issue. But here he says, why am I confident? He says, in part because of the animal studies. But that's why the reasonableness, Your Honor, of our position on the animal studies is critical. Because as of February 2009, and then when we submit the NDA, we believe that we have addressed the concerns. What we have shown is that with regard to cancerous tumors, the tumors only occur at doses that are irrelevant to human risk. With regard to benign tumors in the study, we think what we've shown is that it's caused by a non-human-specific mechanism, a rat-specific mechanism, because of the increase in prolactin, which has no relevance to humans. So if I'm confident, I would stand up and say, we test things all the time, and it turns out that there is no relevant risk. So in fact, that statement of opinion, what is the basis of your confidence, it's everything. The second statement is Defendant Anderson on September 18, 2009. And in that, that was not an earns call, as counsel suggested. That was actually a conference call that was held as a result of the BLOSUM trial results, the second big pivotal phase three clinical trial. And during that call, Defendant Anderson was asked, or the group was asked, whether or not there was anything that was a limiting issue with regard to filing the NDA by the end of that year. And what Defendant Anderson said was, you know, I think we've got everything together. We have favorable results on everything that we've compiled so far. Again, that's why the chronology is so important. It's not until September of 2010 that we realized that the FDA disagrees, at least temporarily, with our results. We, as far as they were concerned So you didn't know between February 2009 and September of 2010, you didn't know that the FDA had any further concerns? They never expressed any concerns during that time period. So during that time, you were sort of free to say, because you had submitted the final report, we've satisfied all their concerns, and therefore the final studies are everything's okay. That's right. And your honor, and to be clear, this is why it goes back to my very first point. That position, if that position was unreasonable, like in Omnicare they talk about, if it turned out that we had no real basis to believe, we checked all the boxes, that would be one thing. But it was reasonable, based upon the analysis that had been undertaken. And by the way, your honor, ultimately the FDA agrees 100% with our analysis. I'm sorry, your honor. It seems a little unsure. If one starts out submitting something to the FDA, and the FDA says, well, we don't feel very good about this, and therefore we're going to ask for things we wouldn't normally ask for, and you just submit stuff that they then ask for, it doesn't seem to me that one could come out and say, we've had favorable results on everything we've compiled so far. I mean, it seems to me, if I look at Matrix, and I look at what they're really suggesting here, we can't say we've had favorable results on everything we've compiled thus far, if we know inside the company that it's a rat study that the FDA looked at and asked us to give us bimonthly reports and follow-up studies. So this is the sort of the unitary, Ron Coney sort of scienter overlap with falsity. I, your honor, we believe we set out, and the record is quite clear, that that statement is, first of all, not false. They had, they did have favorable results. And your honor, when you look at what the FDA... How do we know it's favorable results? The FDA has never said they're favorable. In fact, the FDA has said on the opposite, that we now need bimonthly reports, and we've got to have more studies. But again, your honor, they said that in 2007. This statement is two years later, after we submitted the report to the FDA. But the second issue here is whether or not they've adequately alleged scienter. Put aside for a question whether or not that's true or not, and by the way, favorable to me is a qualitative assessment, meaning it's sort of a core opinion type of statement. But then the question is scienter. Is it an extreme departure from standards of ordinary care for a company who has submitted reports, hundreds of clinical studies, a hundred preclinical studies, 18 clinical studies, to say that we think we have favorable results when in fact they internally have identified that there's a safety margin with regard to cancerous tumors in a non-human specific mechanism with regard to the other terms. And again, your honor, ultimately the FDA agrees with this. What happens, if I can make two more points, what happens is in September 2010 when the FDA initially denies the NDA, they raised this issue. And what they're really concerned about is the fact that the data that had been provided by the company, it's all there, had changed. So when the company was providing the bimonthly reports, it was one set of information. And when they got to the meeting in April of 2008, and then ultimately in the NDA, the numbers had changed. And in fact, some tumors that had been identified as cancerous were changed to benign. And in late 2010 when the FDA denies the CRL, they're concerned about the diagnostic uncertainty. And so what they basically say is, we kind of don't trust you because these diagnoses are moving back and forth. So what we want you to do is we want you to hire five independent pathologists who will review all these tumors on a blind basis and then we'll see what happens. That's what they do. They review all the tumors on a blind basis and they ultimately conclude, in fact, that the company had actually overstated the number of cancerous tumors. When you looked at the FDA's decision in late 2012, which is the third document I identified, you will see that what the FDA said was, now that we have these independent pathologists look at it, we're comfortable with this information and now we agree with you, ARENA, you have in fact showed a non-human specific mechanism of action and you have shown an appropriate safety margin. If I can make two more points, Your Honor, I've run over. Go ahead. I'm going to afford Mr. Stris an opportunity to respond briefly, but we've taken both of you over. I'm going to allow you another minute. Thank you very much. I appreciate it. The two other quick points that I just want to identify is that throughout this period, the company had risk disclosures that were quite clearly filing. The company said the following, preclinical and clinical results are frequently susceptible to varying interpretations that may cause delay or limit regulatory approvals. When did that, when was that said? So I can show you in the 2008 10-K, which was filed on March 16, 2009 at ER2. Was it said in 2007? It was definitely said in 2008, which is in the record. We went back yesterday to make sure it was said in 2007. I have been told that it was, but that's not in the record, Your Honor. It's just not in the record. As I read then, okay. There was an SEC filing in May 2009 that talked about long-term safety demonstrated in your carcinogenic studies, carcinogenicity studies, including preclinical and animal studies. How do you reconcile that? So, what statement specifically? This would have been the SEC filing in May 2009. It's referred to in the second amended complaint in paragraph 200. They told the SEC that, if I'm quoting correctly, that long-term safety had been demonstrated in carcinogenicity, and I've put some ellipses in there, so I hope I haven't misrepresented it. Long-term safety and efficacy of Leucocerin has been demonstrated in part through long-term preclinical toxicity and carcinogenicity studies. These preclinical animal studies are required to help us and regulatory authorities assess the potential risk that drug candidates may be toxic or cause cancer to humans. Can you give me a paragraph, sir? Yeah. But I think this was a statement that may have been issued before. Well, I attributed that statement to Leaf and Hoffman as well as there, but I'd have to find you the exact SER for it. So, what is it specifically that's a concern? It says, to date, long-term safety and efficacy have not yet been demonstrated in a clinical trial for any of our drug candidates except Leucocerin. So this is after the completion of the first typical phase 3 study, that's the Bloom study. The first time you see that language, except Leucocerin, is right after we get the Bloom study. And it's true. What we're saying is, we've got a bunch of drugs in the pipeline. The only one in which we've had clinical studies that show safety is Leucocerin. It's an accurate statement. Well, when I read that, I frankly said, all the data that ARENA has, the public already knows. Or in other words, everything we've got, everybody knows. And I said to myself, how can that be when the public really doesn't know everything you know? They don't know anything about the fact you've had to do more tests because of a rat study. And they don't know anything about the fact that you've had to do more reports. And I said to myself, that seems on the line. Your Honor, I really apologize. I'm not sure what part of that statement communicates that all of the information has been... Okay. All right. That's what I read in it. So, in the final point, and I appreciate the extra time, we identified the Omnicare and the Sanofi cases in our 20HA letter. Obviously, Sanofi is not binding on this Court, of course. It's a Second Circuit decision. But it is very instructive, at least as instructive as AstraZeneca, in my view, in that, in that case, the Second Circuit looked at the fact that there was an active disagreement. And again, I think when you look at the record, there's no active disagreement that we have with the FDA between February of 2009 and September of 2010. But at Sanofi, there's an active disagreement with the FDA, which the FDA was saying, you need to do double-blind studies. And Sanofi was saying, no, we're going to do single-blind studies. And that was never disclosed until there was an FDA briefing book, exactly the scenario that we have, in which the FDA said, we recommend against approval because we don't trust the study results because you used double, single-blind studies. Stock dropped. The Second Circuit, and then ultimately the drug was approved based upon those single-blind studies. The FDA, the Court ultimately said, that's a normal part of the back and forth that exists all the time. And one cannot expect to know, a reasonable investor would be expected to know that they would have all of the back and forth that exists between the FDA and the regulated. Okay. I think we understand the argument. Thank you very much, Mr. Dwyer. Thank you, Your Honor. Mr. Strickland, I'm going to give you two minutes, and I'm going to hold you hard to that time. Thank you, Judge Bybee, I appreciate that. I guess I'd like to focus on only one thing, because I think from a procedural standpoint, there's actually a pretty clear joinder of arguments here, in terms of our position and where my friend disagrees. So our position is that the totality of the allegations that we've pled, and when I got up here to start, I listed where many of them are, support the inference that defendants intended to give investors the impression that there was no known material risk to FDA non-approval or delay. Now, you just heard my friend, and his position is equally clear. He says, and he's hanging his hat on the fact, that there was no active disagreement, and so the fact that the FDA did not express specifically, after getting the final RAT study, that they disagreed, allowed them to do what they did, and means that my inference of Sienter is not equally plausible to his. He doesn't dispute a few things, though. He doesn't dispute that during that period, there was a meeting with the FDA, he calls it routine. He doesn't dispute that, at that routine meeting, they were told, you better cover the RAT breast cancer in your new drug application. And I think that's significant, because I would suggest that the government's silence, or what he calls silence, is ominous. It's not a positive thing for them. I could flip it, and I could say, well, did you get a letter from the FDA saying this issue was resolved? At that routine meeting, did they tell you don't worry about it? But why is Leaf's statement in March of 2009 not true, when he says, all the animal studies that have been completed, if what ARENA had done was completed the study, and sent it over to the FDA in February 2009, and they haven't heard anything back from the FDA disputing? So, I will answer that directly, and then I'd like to link it to the totality, but I think, viewed in isolation, it's clearly misleading, because the dispute happened in the middle of 2008, and the FDA almost shut the human studies down. The final studies were given on February 3rd, Your Honor, of 2009. His statement was less than a month later. He said he had confidence based on the animal studies. He had no indication that the FDA had even read his final report, let alone agreed with it. In other words, the point I'm making is, even if you give credence to their argument, that 10 months of silence allows you to say everything's fine, certainly a month of silence doesn't allow you to say that you have confidence in the animal reports. It supports at least an equally plausible inference, and that's all I'm required to establish under TellLabs, an equally plausible inference that what they did was try and give the public the impression that this issue was resolved. And I would end just by saying, what would it look like if we were right? In a pre-discovery world, if there were people who were trying to perpetrate this fraud, what would the record look like? It would look precisely like what we've alleged and what's happened here. I thank you for your time. Thank you very much. We thank both counsel for the argument. Case is ordered submitted.
judges: Pregerson, Bybee, N.R. Smith